FRANK B. WEEKS ET ALS., TRUSTEES, *vs.* BURTON
MANSFIELD, ADMINISTRATOR, ET ALS.

Third Judicial District, New Haven, June Term, 1911.

HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

As applied to certain relations or conditions, words frequently come to
have a meaning different from their usual signification, and when
so used they should be construed accordingly, in order to effectuate
the intent of the user.

The word "pauper" designates one whose support imposes a burden
upon the public treasury; while "indigent" is more commonly used
to describe one who is without property or means of comfortable
subsistence but who is not a public charge.

This distinction between paupers and indigents not paupers is drawn
in chapter 102 of the Public Acts of 1867, § 4, relating to the com-
mitment to and support of insane persons in the Connecticut Hos-
pital for the Insane at Middletown.

By his will executed in October, 1867, the testator, who was evidently
interested in the care of the insane poor and aware of the provisions
of the Act passed three months earlier, gave property worth about
$24,000 and subject to life uses which terminated in 1886, to the
trustees of the Connecticut Hospital for the Insane in trust, to
use the income thereof "for the support of indigent insane per-
sons," requesting a preference to be given to those belonging to
and having a legal residence in Hamden, which was the testator's
native town. In a suit by the trustees to determine the construc-
tion of this provision it was *held:* —

1.  That the testator intended by his language to preserve the statutory
    distinction between paupers and indigent persons not paupers, and
    to confine his bounty to the latter class; and that the language
    should be so interpreted.

2.  That the Connecticut Hospital for the Insane at Middletown, and
    no other, was the institution in the immediate view of the testator,
    and therefore under most conditions it would be the duty of the
    trustees to expend any balance of income, after Hamden residents
    in that hospital had been provided for, in the support of other
    indigents cared for in that institution.

3.  That in case of a lack of accommodations at the Middletown hos-
    pital, the trustees would have the right, in the due execution of
    their trust, to make expenditures for the support of Hamden's
    indigent insane in the State hospital at Norwich.

4.  That under present conditions expenditures could not properly be

made for the support of indigent persons elsewhere than at one of the State institutions.

Argued June 7th—decided July 31st, 1911.

SUIT to determine the construction of the will of George Atwater of the town of Hamden, deceased, brought to and reserved by the Superior Court in New Haven County, *Ralph Wheeler, J.*, upon the facts alleged in the complaint, for the advice of this court.

*Alvan Waldo Hyde*, with whom was *John H. Light*, Attorney-General, for the plaintiffs.

*Charles F. Clarke*, for the Town of Hamden, one of the defendants.

PRENTICE, J. George Atwater of Hamden made his last will October 26th, 1867, and died a short time thereafter. By his will he directed trustees thereunder to convey the residue of his estate, after the termination of two lives, to the persons who at the time of such conveyance should constitute the board of trustees of the General Hospital for the Insane of the State of Connecticut, located at Middletown, in trust. The trust was expressed in the following language: "The said Trustees of The General Hospital for the Insane of the State of Connecticut shall reserve the whole amount received from my estate as a separate fund (to be known as the Atwater Fund) for the benefit of the insane poor of the State of Connecticut and shall have the right to appropriate and expend the annual income of the fund for the support of indigent insane persons, giving preference to indigent insane persons, if any such there may be, belonging to and having legal residence in my native town of Hamden, but the said trustees shall not appropriate or expend the principal of the fund."

January 26th, 1886, this residue, then amounting to $23,975.81, was, pursuant to the terms of the will, turned over to the then trustees of said institution, and the trustees thereof for the time being have ever since continued to administer the trust created by the will. The name of the institution was in 1874 changed by substituting the word "Connecticut" for the word "General." 7 Special Laws, p. 821. It will hereinafter, for brevity's sake, be referred to as the Connecticut Hospital, as will the similar institution, quite recently organized and located at Norwich, be designated as the Norwich Hospital. The trustees, by the advice of counsel, have declined to appropriate and expend any of the income of the fund for the support of paupers, whether residents of the town of Hamden, or of any other town, or for the support of insane persons confined as indigents in the Norwich Hospital, or in any other institution or place, even though they were legal residents of Hamden. In making expenditures of the income they have confined it to the support of persons committed to the Connecticut Hospital, giving preference to those of its inmates who were legal residents of Hamden, and had been committed as indigents. In this way the greater portion of the income has been expended. But when some portion remained after all those of the class last described had been provided for, the trustees have from time to time appropriated from such balance sums for the support of indigent persons committed to said institution who had no legal residence in Hamden.

Claim is now made on behalf of that town that the language defining the trust requires of the trustees different action on their part, in this: that if the entire income of the fund should not at any time be appropriated for the support of indigent residents of Hamden confined in the Connecticut Hospital, the

balance should be applied to the support of insane indigent residents of that town confined in the Norwich Hospital or any other institution or place, and that, if such income should not then be exhausted, any balance should be appropriated and expended for the support of insane paupers belonging to and having a legal residence in Hamden.

In view of these claims this complaint has been brought to the Superior Court by the present trustees for its advice in answer to the five following questions, to wit:—

"(a) Have said trustees the right to appropriate and expend any part of the annual income of the fund created by said clause of said will for the support of insane paupers, as distinguished from indigent insane persons, belonging to and having legal residence in said town of Hamden?

"(b) Have the said trustees the right to appropriate and expend any portion of the annual income of said fund for the support of indigent insane persons belonging to and having legal residence in said town of Hamden who are confined at The Norwich Hospital for the Insane, or any institution or place other than said hospital at Middletown?

"(c) Is it the duty of said trustees to appropriate and expend any portion of the annual income of said fund for paupers belonging to and having legal residence in said town of Hamden, when the number of indigent insane persons confined in said hospital is insufficient to exhaust the entire annual income of said fund?

"(d) Is it the duty of said trustees to appropriate and expend any portion of the annual income of said fund for the support of insane paupers belonging to and having legal residence in said town of Hamden, when the number of indigent insane persons confined

in. the said Hospital for the Insane at Middletown, or in The Norwich Hospital for the Insane, or in any institution or place other than said hospital at Middletown, is insufficient to exhaust the annual income?

"(e) Have the said trustees the right in any case to appropriate and expend any portion of said annual income for the support of insane paupers, whether belonging to and having legal residence in said town of Hamden or not?"

It will be noted that four of these questions gather about a single general one—as to the right of the trustees to expend any part of the income of the fund in the support of insane paupers chargeable to the town of Hamden. The third and fourth on the list admit of a construction which manifestly was not intended. Thus construed, they reach out to situations which are so clearly beyond the range of present possibility that it is not conceivable that advice pertinent to them is desired. One, thus construed, is sufficiently broad to include a situation where the number of indigents confined in the Connecticut Hospital was insufficient to exhaust the income of the fund in their support; while the other would carry the situation to the further extent of assuming that the number of indigent insane, whether confined at Middletown, Norwich, or elsewhere, was insufficient to use up the income of this fund of less than $25,000. It is evident that the language of the two questions was used with reference to no such situation, but to define one where the support of indigent insane residents of Hamden confined in the Connecticut Hospital, in the one case, and there or elsewhere, in the other, did not exhaust the current income. Our advice to the Superior Court is given to the questions thus restricted in their scope. We are thus excused from determining the question of possible academic interest, as to what the duty of

the trustees would be if there were no other persons than paupers who could receive support from this income.

The term "pauper" has a distinct and well-defined meaning in our law. It is used to designate those persons whose support imposes a burden upon the public treasury. One may be ever so destitute of estate or ability to earn a livelihood, and yet not be a pauper. He may be cared for by the voluntary action of friends or relatives. The duty to care for him may by law be cast upon relatives. He becomes a member of the pauper class only when, other means of support failing, he becomes a public charge. This has long been so. General Statutes, 1821, p. 369.

The term "indigent," on the other hand, is one which in its common acceptation is used with more direct and single reference to financial ability and resources. It is ordinarily used to indicate one who is destitute of property or means of comfortable subsistence, and for that reason is needy or in want. Webster's New International Dictionary. As thus used, a pauper certainly fully supplies the conditions. But words oftentimes come to have a meaning in certain relations or as applied to certain conditions other than their ordinary meaning, and when so used they are to be construed accordingly in order that the intention of the user may be effectuated.

Statutory provision for the public care of insane paupers has existed in this State ever since 1699 at least. Col. Rec. 1689–1706, p. 285. Prior to 1866, however, there was no State institution in which they might be cared for. In that year the institution of which the plaintiffs are the trustees was established, and its government placed in the hands of a board of trustees. No provision was made for commitment thereto or support therein, but the preamble of the

Act plainly indicates that it was designed as a place for the care of the insane of the State, including paupers. The following General Assembly, by an Act which was approved and went into effect July 23d, 1867, more fully outlined the policy of the State in respect to the institution. It dealt, among other things, with the subjects of commitment and support. The regulations thus adopted divided its inmates into two entirely distinct classes, and made different provisions as to each. One class was made to consist of insane paupers. Proceedings for their commitment were to be begun by the first selectman of the town, and the town of the inmate's legal residence was made chargeable with one half of the cost of support, the State paying the other half. The other class was made up of persons described as persons in indigent circumstances, not paupers, who had become insane. Proceedings for the commitment of such persons might be made by any one, and the one half of the cost of support not borne by the State was chargeable to the person making the application. Public Acts of 1867, p. 107, *et seq.*

Mr. Atwater made his will three months after this Act went into effect. It is evident that he was fully informed of the Act of 1866 establishing the hospital. His strictly accurate use of its somewhat elongated name, and his selection of its governing board, correctly described as trustees, to execute his trust, sufficiently attest this. It is evident that he had followed the history of the proposed enterprise, since he was able to describe its chosen location. That he knew of the passage of the Act of 1867, and its provisions, is also apparent, else how came he by the knowledge that its scheme contemplated the care of indigents. Clearly he was deeply interested in the subject of the care of the insane poor, and we must conclude that

Weeks *v*. Mansfield.

when he gave his thought to his testamentary provisions he knew what the State had done and contemplated doing at the institution at Middletown. These facts and the significant sequence of the dates upon which the Act was approved and his will executed, together with his use in his will of descriptive language similar to that contained in the Act, combine to create an inference well-nigh irresistible that he was familiar with the policy of the State embodied in the Act of 1867, and continued in substance to this day, of treating paupers and indigents not paupers as belonging to entirely separate classes subject to separate treatment, and that he formulated the language of his will in recognition of that policy and the distinction which it established. We, therefore, conclude that when he made provision for insane indigents he used his language in the sense indicated by the statute, and intended thereby to confine the class of persons who were to be the beneficiaries of his bounty to insane indigents who were not paupers, and to exclude paupers, the burden of whose support rested upon the public and in no measure upon individuals.

The answer to the remaining question, which is the second in the order of their statement, involves altogether different considerations. It is not limited in its application to any specified case or cases, or to any particular situation or situations, but is broad and general in its terms. It is fair to assume, however, that it was framed with reference to existing conditions in respect to public institutions and their government and to legislation, and we so interpret it. Even with this limitation we are, in advising as to the answer to be returned to it, met with the difficulty that it is not directed to any stated cases or conditions, and we are left uninformed as to what situations have arisen to perplex the plaintiffs and call for their decision. We

are left to deal with the general subject presented as related to any and all conditions which may occur to us as possible to have arisen.

This being the character of the question, we are unable to advise any other categorical answer to it than an affirmative one, since we are of the opinion that a condition might exist, and perhaps does exist, which would justify expenditures by the trustees for the support of insane indigents confined in the Norwich Hospital, and possibly in a more remote contingency in other institutions. As such a reply, so given, might readily be misleading, and certainly would not be practically informing, we ought, perhaps, to go further in explanation of it.

Mr. Atwater doubtless made his will under the inspiration of the action of the State in establishing the Connecticut Hospital and in prescribing the service it was to perform. He saw in it the State's agency for the performance of its duty toward its insane poor. He wished these unfortunates to become the beneficiaries of his bounty. His study of the legislation disclosed that they, as residents in the institution, would come under the control and management of a board of trustees representing the State. He therefore, not unnaturally, turned to the members of that board for the time being to be his chosen almoners. They doubtless appealed to him as peculiarly fitted to exercise the discretionary powers he proposed to confer. His plan and purpose was without doubt one which had the new institution in immediate view, and no other, and he built up his scheme of benefactions around it and its organization. His main purpose was, as expressed by him, to benefit the insane poor of the State. His charitable design assumed no narrower form. Incidentally he desired that preference should be given to residents of his own town in the class to be

helped, and that desire he expressed. But his plan in its main and predominating features looked beyond these individual cases, and had a larger controlling purpose. His incidental direction that preference be given to Hamden residents is, of course, one which the trustees are called upon to observe. But income expended by them for the support of insane indigents confined in the Middletown institution, and having their legal residence in the State outside of Hamden, is not diverted into channels outside of his main scheme of benefaction. Is it diverted from channels designated by the testator in prescribing the duty of the board in the incidental matter, provided it is so expended while legal residents of Hamden confined in the Norwich Hospital or elsewhere are passed by? We are of the opinion that under most conditions it is not, and that under such conditions it is the right and duty of the trustees to expend any balance of income remaining after Hamden residents confined in the institution under their charge shall have been provided for, in the support of other indigents cared for in that institution.

There is, however, one possible and perhaps existing condition under which such a course of action would not result in an execution of the trust conformably to the testator's intention gathered from the provisions and general scheme of his will. Section 4 of chapter 196 of the Public Acts of 1905 provides that insane persons, committed from portions of the State lying without the counties of New London, Windham, and Tolland shall, except as otherwise provided by law, be sent to the Connecticut Hospital. The following section provides that the commitment of indigents may be to either of the two State institutions "at the discretion of the court of probate upon consideration of a request made by the person applying for such commitment." In the natural course, therefore, it may be

expected that Hamden's indigent insane will be found in the Connecticut Hospital, if its accommodations are sufficient to receive them. Where a commitment of such persons is to the Norwich Hospital as the consequence of a request from the applicants, who are chargeable with the expense of support above that portion borne by the State, the applicants may well be held to have voluntarily foregone the benefit which might otherwise accrue to them from Mr. Atwater's gift. Where, on the other hand, commitment to the Norwich Hospital results from inability to gain admission to the Connecticut Hospital on account of its lack of accommodations, the situation is different. In such case the State forces a course of action upon the parties and the committing court. It in effect interposes to put an end to conditions which the testator had in view. His conception of the Connecticut Hospital was of one which was at least open to those for whom admission was sought. A due regard for his secondary or incidental purpose requires that his intention should not be frustrated by the State's failure to make adequate provision for the care at Middletown of those for whom in the natural order admission there would be sought. We are, therefore, of the opinion, and so advise the Superior Court, that in such cases the trustees would have the right, in the due execution of their trust, to make expenditures for the support of insane indigents confined in the Norwich Hospital. *Hayden* v. *Connecticut Hospital*, 64 Conn. 320, 324, 30 Atl. 50. We are able to anticipate no other conditions in which that would be true.

Prior to the establishment of the Norwich Hospital our law provided that the committing court, in the event that the Connecticut Hospital was unable to receive additional inmates, might commit to other institutions. General Statutes, § 2742. In 1905, fol-

lowing the establishment of the Norwich Hospital, this provision was dropped, and that already quoted, contemplating the commitment of indigents to one of the State institutions, adopted. Public Acts of 1905, Chap. 196, § 4. Transfers to State institutions of persons originally committed elsewhere are authorized. General Statutes, § 2756. We advise that under present conditions the trustees are not authorized to make expenditures for the support of persons who are confined in other than one of the State institutions, unless it possibly be in the contingency that confinement in such other institution is compelled by the State's inability to furnish accommodation in its own institutions. In the absence of information that this contingency is one which has arisen or is to be apprehended, we have no occasion to deal with it.

The Superior Court is advised to render its judgment of advice in conformity with the conclusions herein expressed.

In this opinion the other judges concurred.