## John D. Britton et al., Trustees (Estate of George P. McLean) v. Robert K. Killian, Attorney General

Superior Court      Hartford County      File No. 155171

Memorandum filed July 10, 1968

Robinson, Robinson & Cole, of Hartford, for the plaintiffs.

Robert K. Killian, attorney general, and David B. Beizer, assistant attorney general, for the defendant.

SHAPIRO, J. The trustees under a trust created by the seventeenth clause of the will of George P. McLean have instituted this action, naming the attorney general as defendant as representative of the public interest in the protection of trusts for charitable uses and purposes pursuant to § 3-125 of the General Statutes. They seek an adjudication that the dominant intent of the testator as expressed in clause seventeenth of his will can be carried out under the doctrine of approximation or, in the alternative, an adjudication that the fulfilment of that dominant intent will be prevented by strict adherence to so much of clause seventeenth as limits expenditures for construction of the McLean Home in the first instance to not more than 20 percent of the trust fund then held for investment purposes; an order authorizing the trustees to spend up to $3,500,000, or such other sum as may appear requisite to the court, for the construction of the McLean Home in the first instance; any other equitable relief; and, finally, a reasonable allowance of counsel fees and costs.

In the last computation, on March 26, 1968, the principal of the trust fund was over $10,900,000. In 1950, it amounted to close to $3,000,000; between October 25, 1961, and January 1, 1962, it reached $10,200,000; in 1962 it dropped to $9,342,000; on January 1, 1963, it reached over $10,000,000 and has remained so ever since. Thus, 20 percent of the

principal of the trust fund held for investment purposes amounts to about $2,250,000.

When the trust fund reached $10,000,000, the trustees spoke with various people experienced in the field of old people's homes and hospitals. They decided on obtaining a survey and engaged Dr. Anthony J. J. Rourke, a hospital consultant with the highest reputation in the nation. He studied the problem with all its ramifications and came up with a voluminous and detailed survey report, including recommendations, summary discussion, findings and exhibits which related to the testator's will pertaining to the establishment of the McLean Home. This Rourke study and report cost the trustees $20,000. Basically, Dr. Rourke's opinion was that it is not possible nor feasible to construct and operate such an institution as the trustees indicated with the funds available and that the objectives set forth in the will could be accomplished if the trustees purchased the necessary services for the beneficiaries rather than attempted to furnish them by operating a home. Thereupon, the trustees brought legal counsel into the matter because the feeling was that Dr. Rourke was proposing something not clearly set forth in the will. On February 21, 1966, they engaged a full-time employee, Howard Pfirman, a man with considerable hospital administration experience, to be the executive director. He made many studies and on October 18, 1966, the trustees accepted his concept of a "total care program" in the belief that this was ideally suited to the terms of the will.

Sidney L. Katz, an experienced architect specializing in planning health and hospital facilities, was engaged through Pfirman to draw plans for the proposed McLean Home, contemplating a "total care" concept. Various proposals were made and submitted to bid. The lowest base bid received was

$4,220,000 for a 220-bed capacity facility. Alternative plans were also submitted which related to a smaller bed capacity (down to 100 beds), the lowest estimate being in excess of $3,000,000.

The trustees have made no effort to seek federal financial assistance because it was felt that this would cause an interference with the trustees' plans. No effort was made to get assistance from the state of Connecticut. No approach was made to any outside fund. No evidence, however, was produced to show how much financial aid would be available, if any, from these possible sources. During the past five years, the trustees have spent a yearly average of $60,000 plus an added $60,000 for bank fees and salaries. When Pfirman was hired, he received over $1800 a month and now receives over $2000 a month.

While the proposal for a "total care" concept is most laudable and while the proposed facilities would be a great advancement over conventional convalescent home or hospital care, and while there is no facility in this country to compare with the one proposed by the trustees, the task of this court is to determine whether the will permits the utilization of the money claimed by the trustees to be needed for this project.

A careful reading of the will indicates a document drawn with care and discernment for the wishes of the testator. Specific things are provided for and safeguards are there contained. The will refers to the McLean Home in various places and then empowers the trustees to "use or expend the balance of the income of the trust estate for the purposes of the McLean Home"; and then follows paragraph (G) under the seventeenth clause. After a most careful discussion of the fund and its reaching $10,000,000 and of the "McLean Home," the last sentence of (f) under paragraph (G) provides: "I

direct the trustees not to expend for the construction of the Home more than 20% of the principal of the trust fund then held for investment purposes." The evidence is clear that the trustees cannot build the kind of home they claim was envisaged by the testator without exceeding this 20 percent limitation, which amounts to about $2,250,000.

The crucial portions of the will for purposes of this action are the seventeenth and nineteenth clauses. Evident throughout clause seventeenth are the dual purposes of the testator, one, to provide benefits for specified noninstitutionalized residents of Connecticut, and, two, to construct a home for some of the same beneficiaries. The two purposes are to be served concomitantly, and it does not appear that preference is given to one purpose over the other. The second paragraph of clause seventeenth recites that "the primary purpose of said trust shall be the maintenance and development of the McLean Game Refuge and the public and charitable purposes hereinafter indicated including at the proper time the erection, maintenance and operation of the McLean Home and the other uses and purposes as hereinafter provided." It is on this ground, inter alia, that the attorney general contends that the deviation from the terms of the will sought by the trustees is not in the public interest. The further claim is that this would be an expenditure of unauthorized corpus which will seriously impair the fulfilment of the purpose to provide income for the care, maintenance, welfare, support, nursing and medical attendance of Connecticut persons not resident in the McLean Home.

It is also pointed out that subparagraph (d) of paragraph (G) of the seventeenth clause speaks of "facilities for growth." The same subparagraph refers to "the cost of additions to the Home or future contingencies." Subparagraph (f) of para-

graph (G) speaks as follows: ". . . I direct said trustees as soon thereafter as may be feasible to construct . . . a home or hospital . . . ." Also, in subparagraph (f), just before the reference to the 20 percent limitation, appears the clause, "[T]he buildings constituting the Home may be added to from time to time as funds may permit . . . ."

Rather than construct a home or a hospital, the attorney general claims the trustees have chosen to construct what amounts to both, in a "total care" facility. Rather than design a modest building or buildings, to be later added to, they have chosen to construct an all-inclusive complex, offering many and varied services and activities. The attorney general contends that the trustees seek in effect the application of the cy pres doctrine or that of approximation or what is regarded as the rule of deviation.

The trustees say they seek to invoke the principle set forth in Restatement (Second), 2 Trusts § 381, as follows: "The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust." They add that this rule, while rather closely related to the doctrine of cy pres or approximation, is nevertheless a distinct one. Sometimes called the rule of deviation, it applies to both private and charitable trusts and may appropriately be invoked whenever, through the intervention of unforeseen developments, achievement of the trust purposes becomes impracticable or impossible because of the impact of one or another of the incidental provisions of the trust. Id. § 381, comment a.

The trustees argue further that it is hardly to be supposed that the testator could have intended that an institution designated by him to memorialize his mother and his aunt should be a second-rate affair; that, on the contrary, the only reasonable inference is that he visualized the home as a facility which would be calculated to achieve excellence, if not pre-eminence, and so to honor those for whom it was named. A further claim is that subparagraph (f) of paragraph (G) in the seventeenth clause does not confine itself to the use of the word "home" in describing the proposed facility and that the term "hospital" also appears. As added support to their position, the trustees refer to subparagraph (b) of paragraph (G) and contend that since the testator's death in 1932 it is common knowledge that construction costs have increased. With that in mind, it would appear that in setting his ceiling of about $2,000,000 the testator must have had in mind a type of building which could not be reproduced today for less than $4,500,000 or, more probably, for less than $5,000,000 or $6,000,000.

The trustees ask the court to find that the dominant intent of the testator as expressed in clause seventeenth of his will and the objects and purposes of the McLean fund can be carried out under either the rule of deviation or the doctrine of approximation, and to authorize the trustees to expend in the first instance $4,100,000 for the construction of the McLean Home. This would be calculated to enable the construction of about a 200-bed facility as described in the testimony.

The court has studied the five principal cases cited in the trustees' brief, namely, as follows: *Second Ecclesiastical Society* v. *Attorney General,* 133 Conn. 89; *Colonial Trust Co.* v. *Brown,* 105 Conn. 261; *Charlotte Hungerford Hospital* v. *Mulvey,* 26

Conn. Sup. 394; *Williams Memorial Institute* v. *Beers,* 18 Conn. Sup. 512; *Hinman* v. *Windham National Bank,* 14 Conn. Sup. 14. None of these cases are sufficiently similar to the case at bar to be considered as precedent. The McLean case, like all other charitable trust cases, should be decided on the basis of its unique factual circumstances, the particular will that is being construed, and the public interest as it may be affected by the proposed deviation. *Second Ecclesiastical Society* v. *Attorney General,* supra, 95.

The doctrine of cy pres or approximation has been invoked many times by our courts. If property is given in trust to be applied to a particular charitable purpose and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general purpose of the settlor. *Shannon* v. *Eno,* 120 Conn. 77, 86. Thus, if the dominant intent of the testator is said to be charitable, "the means . . . designated to accomplish that purpose should not defeat it if, in substance, it may be" effectuated "in another way." Id., 89; see *Waterbury Trust Co.* v. *Porter,* 131 Conn. 206. Notwithstanding the apparent breadth of this doctrine, cy pres is not applicable here. The testator in the instant case provided alternative means of accomplishing his purpose, and in that case that doctrine could have no application, at least in its broader aspect. *Hartford National Bank & Trust Co.* v. *Oak Bluffs Baptist Church,* 116 Conn. 347, 351.

The objective of establishing the McLean Home is not illegal or impossible or impracticable. Several conclusions seem demonstrably clear. The contem-

plated institution was to consist of more than one building or facility; the trustees could add to the initial building or buildings from time to time as moneys they had at their disposal allowed; and the trustees could reasonably elect to construct either a home or a hospital and are not bound to construct what Howard Pfirman described as a "total care" facility, containing among other things, a baseball field, physical therapy rooms, gymnasium, auditorium, private bathrooms, a quiet room, a talking bookroom, a volunteer room, a classroom, a store and a loan closet.

In this regard, it should be stated that the various "alternatives" the trustees, Pfirman, and Katz considered are but variations on the same theme of a "total care" facility. These alternatives provide no differentiation as to the scope of the facility to be constructed; they merely vary the stages of completion of the basic plan engendered by Pfirman and adopted by the trustees. This is not to say that the court rejects or criticizes the well-intentioned ideas of the trustees and of Pfirman in attempting to achieve a facility with "social significance," a facility that enhances "the dignity of the individual" through "congenial concern." It is to say, however, that in terms of what is in the public's interest and what accords with the testator's explicit directions, no circumstances have been demonstrated justifying a departure from the specific terms of the will, a departure justifying an expenditure of substantially more than the approximately two and one-quarter million dollars available.

Before leaving this area of discussion, several additional points should be made. The first is that the trustees have not shown public need for the particular "total care" facility conceived by Pfirman. Hence they cannot contend that unanticipated cir-

cumstances would frustrate fulfilling any particular intent of the testator. Surely, a more modest or more limited facility would amply satisfy not only the express provisions of the will but the general intent of the testator as well. The second point is that the will itself recognizes that the point in time when the trust corpus reaches $10,000,000 is not necessarily the right time to begin constructing a facility. Thus, the will speaks in the following terms: ". . . as soon thereafter as may be feasible . . . ." Quite clearly, if what the trustees claim is true, namely, that the home contemplated by the testator cannot now be built for two and one-quarter million dollars, then at the present it is not feasible and present plans should be discontinued until such time as it is feasible. The present financial inability of the town is not necessarily a permanent condition, nor is it certain that the contingency, to which the testator looked forward, of a corporation or association being formed for the purpose of maintaining an academy or high school north of Mill Bridge may not yet be realized. It is not impossible that the specific intent of the testator as to the application of income may hereafter be carried out, and in the meantime the discretionary powers given to the trustees are sufficient to enable them to carry out the general charitable purpose of the testator. *Newton* v. *Healey,* 100 Conn. 5, 12.

While there is no doubt that the "total care" facility envisaged by Pfirman and accepted by the trustees would be the most outstanding and unusual in this entire country, the court, by law, cannot give unbridled authority to the trustees. A situation justifying a deviation does not exist in this case. Even if it did, subsequently occurring events cannot, under Connecticut law, change the construction of the will. *Redpath* v. *Auchincloss,* 132 Conn. 690, 695; *Bartlett* v. *Sears,* 81 Conn. 34, 41; *Weed* v.

*Scofield,* 73 Conn. 670, 675. The evidence does not demonstrate circumstances so changed as to necessitate a rewriting of the McLean will, nor can it be said that not to accede to the "total care" plan of the trustees will defeat or substantially impair the accomplishment of the purposes of the trust. The evidence does not demonstrate that there has been an intervention of unforeseen developments through which achievement of the trust purposes becomes impracticable or impossible because of the impact of one or another of the incident provisions of the trust. Pfirman testified that a home, though certainly not the one he contemplates, could be built within the $2,250,000 amount presently available. As pointed out by the attorney general, Pfirman stated, "I am not saying that it cannot be done," and again said, "[Y]ou get along with what you have."

It rests with the court, although it is not required to do so, at least to indicate that the trustees could construct a more modest structure, using the presently available funds of $2,250,000, or construct a portion of the planned facility, leaving to the future, if and when more money is available, the adding of additional buildings or wings, or construct the proposed "total care" facility provided federal, state or private grants are available to make up the difference in cost, or use some of the available money to purchase services in existing institutions and some, within limits, to construct a memorial in accord with the testator's wishes, or continue to provide benefits to noninstitutionalized Connecticut residents, waiting until such time as there is enough money available to construct the kind of facility desired by the trustees without violating the express terms of the trust.

The claims for relief made in paragraphs (1), (2) and (3) order are hereby rejected and denied for

the reasons already given. As to (4), the court cannot grant any other or further relief.

As to the claim for allowance of attorneys' fees, the amount sought comes to about $40 an hour and covers a time consumption of ninety-four and one-half hours. Unquestionably, great effort and much time was devoted to the development of this case and the subsequent proceedings. The court has no reason to reject the requested counsel fees as unreasonable. Counsel are competent and highly regarded and are entitled to fair compensation. The amount requested is $3850, and that sum is hereby allowed as attorneys' fees together with an allowance of $79.38 for disbursements. The statement of services filed on June 15, 1968, is hereby ordered made part of the file.

Judgment may enter in accordance with this decision.