STANLEY DAGGETT ET AL. *v.* THE CHILDREN'S CENTER ET AL.

| SUPERIOR COURT | NEW HAVEN COUNTY AT NEW HAVEN | FILE No. 118670 |
|---|---|---|

Memorandum filed April 9, 1970

*Daggett, Colby & Hooker,* of New Haven, for the plaintiffs.

*Wiggin & Dana,* of New Haven, for the named defendant.

*Robert K. Killian,* attorney general, and *Bernard F. McGovern, Jr.,* assistant attorney general, for the defendant attorney general.

WRIGHT, J. Advice of the court is sought by the successor trustees of a charitable fund as to whether they may continue to pay income to a designated institution, notwithstanding certain restrictions contained in the original trust agreement relating to the religious affiliation of the institution's managers.

In 1864, certain prominent citizens of New Haven and nearby towns established a "Permanent Fund" to aid "in supporting destitute and orphaned children of the Town of New Haven and its vicinity." The subscribers provided for trustees who would choose their successors perpetually. The plaintiffs are the presently serving trustees. The attorney general is a named defendant, as he is charged with representing the public interest in the protection of charitable gifts and trusts. General Statutes § 3-125.

Five trustees were chosen originally "whose duty it shall be to keep the Fund placed in their hands safely invested and shall pay the income derived therefrom semi-annually, or oftener, to the Managers of the New Haven Orphan Asylum for the time being for the accomplishment of this object." A subsequent interlineation in the agreement, assented to in writing by all then and later subscribers, inserted the phrase "provided they shall all be of the protestant faith" immediately following the language "to the Managers of the New Haven Orphan Asylum."

The New Haven Orphan Asylum first was organized in February, 1833, and was specially chartered by the General Assembly in May, 1833. 1-2 Spec. Laws 339. The asylum became known as "The Children's Center," and an official name change was made by the legislature after the commencement of

this action. Public Acts 1969, No. 571. For clarity, the court shall refer to the institution as The Children's Center.

To assist the court in understanding the reasoning of the settlors in adding the controversial interlineation establishing the religious limitation, the parties have furnished the court with extensive historical references to the care of orphans in New Haven at the midpoint of the nineteenth century. Suffice it to say, the manner and style of such care, indeed the basic responsibility for such children, have changed substantially over the intervening years.

At the time this agreement was drawn, a Catholic order of nuns was operating the St. Francis Orphan Asylum, then serving parentless children of the Catholic faith. The defendant institution apparently served such children of the Protestant denominations. Large buildings were operated, which buildings housed youngsters who resided therein throughout their childhood years. Religious training was an important function in the programs of such institutions. An orphan, once taken in, was raised almost as the institution's own child, then released into the outside world upon attaining adulthood.

From the year of its founding to March, 1968, The Children's Center maintained a board of managers exclusively of the Protestant faith. Over the hundred-year period during which the trust has operated, the functions of the Center have changed. Today very few orphaned children are served, although probate courts do give temporary guardianship to the Center of many children without legal guardians, with a view toward ultimate placement with adopting families. The Victorian setting of the large orphan asylum has been replaced with a social approach that finds value in placing such chil-

dren into individual family situations as rapidly as possible. The Center now provides programs of residential treatment for emotionally disturbed children, foster care of regular and emergency nature, adoption services, and assistance to unwed mothers. It has been noted that the St. Francis Orphan Asylum has more recently been called Highland Heights and now operates a residential treatment center for emotionally disturbed children of all creeds.

Religious affiliation plays no role in selection of staff personnel at the Center, and it serves children of all faiths. Without the payments of public funds, from the welfare commissioner, the Permanent Fund income would be grossly inadequate to provide meaningful services to unfortunate children of the New Haven area.

The court finds that the general intent of the settlors was "to aid in supporting destitute and orphaned children," and payment was directed "to the Managers of [The Children's Center] . . . for the accomplishment of this object." The agreement founded a charitable trust under what is now § 47-2 of the General Statutes. The present suit gives rise to the question of how the general intent of the subscribers may be effectuated, where the particular form or manner as originally set forth cannot be followed because of changed conditions. See *Second Ecclesiastical Society* v. *Attorney General,* 133 Conn. 89.

An executive order, issued by the governor of Connecticut on September 28, 1967, relating to discriminatory practices, resulted in the election by The Children's Center on March 7, 1968, of members of its board of managers not of the Protestant faith. The executive order had established a code of fair practices for state agencies, in light of Public Acts 1967, No. 636 (General Statutes §§ 2-53a, 2-53b,

2-53c, 31-122, 31-123), relating to the commission on human rights and opportunities. By article 2 of that order, it was directed that "[n]o state facility shall be used in the furtherance of any discriminatory practice, nor shall any state agency become a party to any agreement, arrangement or plan which has the effect of sanctioning discriminatory practices." A feeling that continuation of an exclusively Protestant board of managers would jeopardize the contractual relationship with the state welfare commissioner led to the broadening of the Center's board of managers.

In recent years, the Center's annual operating revenue of almost $800,000 has included receipts from the commissioner of welfare for the boarding care of children. Such receipts average more than 60 percent of the Center's total revenue. Payments of income from the Permanent Fund have averaged less than one-half of one percent of operating revenue.

When a condition imposed by the donors has proven to be impracticable, the court's function is to determine a practical means of most approximately carrying out the donors' intent. *Citizens & Manufacturers National Bank* v. *Guilbert,* 121 Conn. 520. "The directions of the Settlor with respect to the modes of government or the conduct of an institution created by him may be dispensed with by the court, where these directions seriously impede the usefulness of the institution." Restatement (Second), 2 Trusts § 399, comment q, p. 307. One of the leading Connecticut cases on the subject is *Shannon* v. *Eno,* 120 Conn. 77, 86, wherein the court approved the application of the doctrine of approximation in an appropriate case: "The Restatement summarizes the general rule of law under which courts in this country apply a modified cy pres

doctrine, or the doctrine of approximation, as follows: 'If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general purpose of the settlor.' Restatement . . . [Trusts (Proposed Final Draft)] § 389. In a number of cases we have approved the application of the doctrine thus generally stated where after the administration of a trust has begun, circumstances have arisen such that the method by which the testator sought to accomplish the charitable purpose intended cannot be carried out and, speaking of such a situation, we said in *Newton* v. *Healy, Attorney General,* 100 Conn. 5, 10, 122 Atl. 654: 'It is now certain that the Superior Court, as a court of equity, possesses the power to carry out the general intent of the donor of a testamentary charitable trust, when clearly manifested, though the particular form or manner pointed out by the testator cannot, because of changed conditions, be followed.' In addition to the cases there cited, see *Birchard* v. *Scott,* 39 Conn. 63, 68; *Weeks* v. *Mansfield,* 84 Conn. 544, 554, 80 Atl. 784; *Hewitt* v. *Beattie,* 106 Conn. 602, 622, 138 Atl. 795; *Bankers Trust Co.* v. *Greims,* 108 Conn. 259, 266, 142 Atl. 796; *Russell* v. *Russell,* 109 Conn. 187, 196, 145 Atl. 648."

For a general review of the doctrine of approximation, see 23 Conn. B.J. 419. In applying the doctrine, the court said in *Britton* v. *Killian,* 27 Conn. Sup. 483, 490: "The McLean case, like all other charitable trust cases, should be decided on the basis of its unique factual circumstances, the particular will that is being construed, and the

public interest as it may be affected by the proposed deviation. *Second Ecclesiastical Society* v. *Attorney General,* . . . [133 Conn. 89, 95]."

Here, the Permanent Fund no longer produces annual income which by itself would support effective carrying out of the settlors' general intent to assist destitute and orphaned children. The court believes, as was stipulated by all the parties, that the most practical course to be followed in achieving the settlors' intent is to continue to provide to The Children's Center the annual income of the Permanent Fund, notwithstanding the Center's failure to maintain the exclusively Protestant board of managers envisioned by the settlors. "The result of a too strict adherence to the words of the . . . [donors] often means the defeat rather than the accomplishment of . . . [their] ultimate purpose. [They intend] . . . to make the property useful to mankind, and to render it useless is to defeat . . . [their] intention." 4 Scott, Trusts (3d Ed.) § 399.4, p. 3123. See *In re Queen's School, Chester,* [1910] 1 Ch. 796, discussed in 4 Scott, op. cit., p. 3129, for a case involving a similar religious restriction, concerning the headmistress of a school, imposed by a similar inter vivos trust instrument which had created the school. Years later, government grants-in-aid, essential to continuation of the school, could not be obtained while the religious restriction was maintained. The court held that a plan should be devised doing away with the religious requirement, as the primary intent of the settlor was to maintain a school, and the accomplishment of that purpose was jeopardized unless the particular restriction was abrogated.

Counsel have called the court's attention to *Howard Savings Institution* v. *Peep,* 34 N.J. 494, where the court permitted the beneficiary, a college,

to receive a bequest free of certain religious limitations imposed by the testator, the court finding that it came nearer to the intention of the testator to have the funds actually reach the college free of the religious limitations instead of seeking out some other disposition which might not involve the particular college at all. The theory of the court in *Howard Savings,* as well as the older English decision, offers helpful guidance here.

The court finds that The Children's Center continues to be the natural object for the application of the annual income of the Permanent Fund. The Center provides in the New Haven area the kinds of services most closely approximating the general intent of the settlors. The change in the religious makeup of the Center's board of managers has not affected the operation of the Center. It has continued its longtime policy of treating and caring for children irrespective of religious affiliation, and its staff continues to be selected on a similar basis. It may well be that the broadening of its board of managers will result in a better institution, as its board now may be composed of men and women of diverse religious and cultural backgrounds, reflective of the area and clientele to be served. Such a result cannot help but attract a wider range of ideas, experience and approaches with respect to carrying out the dominant intent of the settlors to aid destitute and orphaned children. To require the trustees to search out a different recipient would jeopardize that dominant intent, as the Permanent Fund's annual income is patently insufficient, except in combination with other moneys, as at The Children's Center, to carry out the expressed general charitable intent of the settlors. It would be impracticable for the trustees to carry out their assigned duties, if they were to act within the limitations of the Fund's annual income.

Accordingly, the court finds that the general intent of the settlors most approximately may be carried out by continuing to pay the annual income of the Permanent Fund to The Children's Center, and the court therefore advises the plaintiffs that they may continue to distribute income of the Permanent Fund to the board of managers of The Children's Center without regard to the religious affiliation of any member of that board, notwithstanding the stipulation in the original trust instrument. Any fear that orphaned or destitute Protestant children would not be cared for in the New Haven area has long since disappeared. The settlors of the trust made no restrictions on the religious affiliation of the children to be served. The Children's Center for many years has sought to establish no particular denominational or religious requirements. Wisely it has enlarged its community base for selection of its managers.

The court approves the continued payment of the Permanent Fund income to The Children's Center. Such continuation will best serve the intentions and desires of the original settlors.